1  Roger A. Wright
   SBN 014105
2  WRIGHT LAW FIRM, PLC
   1013 S. Stapley Drive
3  Mesa, Arizona 85204
   Phone: (480) 558-1700
4  Email: office@wrightlawaz.com

5
   Attorneys for Plaintiffs
6  Trevor Barrett and Barrett Financial, LLC

7
                **IN THE UNITED STATES DISTRICT COURT**
8
                **IN AND FOR THE DISTRICT OF ARIZONA**
9

10

11  BARRETT FINANCIAL GROUP, LLC,          **Civil No.**
    an Arizona Limited Liability Company;
12  and TREVOR BARRETT, a married
    man,                                   **COMPLAINT**
13
                            Plaintiffs,
14  vs.                                    **(TORT/CONTRACT/EQUITY)**

15  BANK OF ENGLAND d/b/a ENG
    LENDING; XYZ ENTITIES, I - X; and      **(JURY TRIAL DEMANDED)**
16  JOHN AND JANE DOES, I - X;

17
                            Defendants.
18

19
        Plaintiffs, Barrett Financial Group, LLC and Trevor Barrett (collectively
20
    "Barrett") for their Complaint, hereby allege as follows:
21
                        **NATURE OF THIS DISPUTE**
22
        1.      This is a civil action filed by Plaintiffs, Barrett Financial Group, LLC
23
    and Trevor Barrett for relief arising from Defendants' misconduct related to a "Net
24

25

Branch" (aka "Affiliate Branch") established by Defendants to provide mortgage loan origination services in Arizona.

## JURISDICTION AND VENUE

2.      This Court has personal jurisdiction over Defendants because the Defendants continue to transact business in Arizona and because at all times relevant hereto the Defendants committed acts in Arizona including, without limitation, acts proscribed by various Arizona statutes.

3.      This Court also has original jurisdiction to hear this Complaint and to adjudicate the claims stated herein under the Federal Labor Standards Act, 29 U.S.C. §201, *et. seq.,* and because the claims herein stated include violations of other federal statutes.

4.      Venue is proper in the United States District Court for Arizona because the Defendants transacted business in this District, and because a substantial part of the events giving rise to the claims occurred in this District.

5.      A substantial part of the events giving rise to the claims occurred in Maricopa County.

## PARTIES

6.      Plaintiff Barrett Financial Group, LLC was and is an Arizona limited liability company with its principal place of business in Maricopa County, Arizona.

7.      Trevor Barrett is an adult resident of Maricopa County, State of Arizona.

8.      Defendant Bank of England is a federally insured banking institution headquartered in England, Arkansas.

9.     In the State of Arizona Defendant Bank of England operates a division known as ENG Lending (collectively "ENG Lending").

10.     ENG Lending sells mortgage loans and other financial products. ENG Lending engages in the practice of taking on an existing, separate mortgage company or broker as a net branch (or affiliate branch) and allowing that separate entity to originate insured mortgages under the approved mortgagee's HUD Mortgage Number.

11.     ENG Lending conducts business at numerous branch locations in many states including Arizona where ENG Lending maintains at least one office or "Net Branch".

12.     Upon information and belief, ENG Lending's gross annual sales made or business done has been not less than Five Hundred Thousand Dollars ($500,000.00) per year or greater at all relevant times.

13.     At all relevant times hereto ENG Lending transacted business in Arizona.

14.     At all relevant times ENG Lending acted through its owners, officers, agents, and employees including, without limitation, Senior Vice President, James Emery (aka Jim Emery), and Senior Vice President, Michael Cupples.

15.     ENG Lending is, and has been, an "employer" as defined by Arizona statutes.

16.     Plaintiffs do not know the true names of Defendants John and Jane Does I through X, inclusive. Therefore, Plaintiffs sue them by those fictitious names. When their true names and capacities are ascertained Plaintiffs will amend their Complaint to insert the true identities.

17.     Plaintiffs do not know the true names of Defendants XYZ Entities, I - X, and therefore sue them by those fictitious names. When their true names and capacities are ascertained Plaintiffs will amend their Complaint to insert the true identities.

18.     Plaintiffs are informed, believe, and thereon allege that the fictitiously designated Defendants were and are the principals, agents, employees, transferees, successors, or assigns of the other named Defendants in this action and/or that said Defendants claim some right, title or interest in the subjects of this Complaint.

19.     Plaintiffs are further informed and believe and thereon allege that said fictitiously named Defendants are liable, responsible, and obligated to Plaintiffs on account of the transactions, performances, and work herein described.

20.     At all times material hereto, each of the Defendants sued herein was the agent and/or employee of each of the remaining Defendants, and at all times acted within the purpose and scope of such agency and/or employment.

21.     Further Defendants' owners, officers, and directors personally acted on Defendants' behalf, and with actual and/or apparent authority, and such acts were ratified by the Defendants, or such owners, officers, and directors acted within the purpose of scope of their employment, agency, or relationship to ENG Lending and the other Defendants.

22.     Further Defendant ENG Lending employed numerous individuals who acted as Defendant's agents as to the events described herein.

## GENERAL ALLEGATIONS

23.     Plaintiff Trevor Barrett formed Barrett Financial Group, LLC in 2002 as an Arizona limited liability company to provide mortgage related services to

Arizona consumers.

24.     In 2002 the State of Arizona granted Barrett Financial Group a mortgage brokers license.

25.     Barrett Financial Group provided mortgage broker services from commercial offices that it leased and occupied in Mesa, Arizona, located at 1910 S. Stapley Drive, Suite 120 ("Mesa Location").

26.     Barrett Financial Group leased or owned all of the equipment at the Mesa Location including, without limitation, all desks, chairs, computers, printers, electronic devices, supplies, and phone systems.

27.     On November 8, 2011, Senior Vice President and Affiliate Branch Director James Emery solicited Trevor Barrett about becoming a Net Branch of ENG Lending.

28.     Emery was interested in Barrett Financial because Barrett Financial had a lot of producing Mortgage Loan Originator's as well as office space and equipment.

29.     On November 16th and again on November 17th Emery contacted Trevor Barrett to solicit Trevor Barrett and his group of Mortgage Originator's to become a Net Branch of ENG Lending.

30.     In February 2012 ENG Lending and Trevor Barrett discussed operating the Mesa Location as a "Net Branch" of ENG Lending. For accounting purposes the branch would later become known as Branch 48.

31.     This net branch structure would permit ENG Lending to have a fully operating and staffed mortgage office in Arizona with many producing Mortgage Loan Originators. By opening a Net Branch, ENG Lending could avoid the expenses

and risks of opening its own retail office. It would allow ENG Lending to generate profits immediately while avoiding large risks, unwelcome delays, burdensome expenses, and numerous administrative hurdles.

32. In order to establish a Net Branch in Mesa ENG Lending offered to employ Plaintiff Trevor Barrett as the branch manager.

33. Hiring Trevor Barrett was attractive to ENG Lending because Trevor already had an established mortgage practice with a high volume of loans. Trevor also has significant industry experience in Arizona and a demonstrated ability to generate borrower leads. In addition, ENG Lending could rely on Trevor Barrett to direct and manage the daily operations.

34. On or around March 9, 2012, ENG Lending's Senior Vice President James Emery emailed various documents to Trevor Barrett, including ENG Lending's Branch Manager Employment Agreement, a Loan Officer Agreement, a Lending Loan Processor Agreement, and ENG Lending's broker compensation structure.

35. ENG Lending drafted the Branch Manager Employment Agreement.

36. ENG Lending also devised the overall operation of the Net Branch.

37. Pursuant to the plan proposed to him, and the documents that ENG Lending later delivered to him, Trevor was to oversee the operation of the Net Branch, would provide guidance and training to branch employees, and retain profit above and beyond ENG Lending's permitted and reasonable administrative and oversight fees.

38. However, Trevor's primary duties were to oversee the origination and processing of mortgage applications that met ENG Lending's requirements and

1  those of its wholesale lenders.

2      39.    Trevor signed and then returned the Branch Manager Employment

3  Agreement.

4      40.    ENG Lending also offered employment to other individuals as

5  Mortgage Loan Officers or Mortgage Loan Originators.

6      41.    ENG Lending drafted the employment agreements for the Mortgage

7  Loan Officers such as Andrew Price which provided that they would be paid an

8  hourly rate equal to the greater of the federal or state minimum wage for each hour

9  worked up to forty hours per week, that they would be paid 1.5 times their regular

10  hourly rate for any hours worked in excess of forty hours per week (both payments

11  to be known as the "Draw Guarantee"), and that they would not work more than

12  forty hours in a work week without management approval. In addition, Mortgage

13  Loan Officers were to be paid commissions on the origination of residential

14  mortgage loans.

15      42.    In addition to the employment agreements, ENG Lending agreed to

16  assume the financial responsibility for the Mesa Net Branch location. Barrett

17  Financial Group, LLC already occupied the commercial space and was under

18  contract for this location. ENG Lending agreed to assume Barrett Financial Group,

19  LLC's existing commercial lease.

20      43.    ENG Lending's agreements with Trevor Barrett and Barrett Financial

21  Group, LLC included a commitment from ENG Lending to pay the monthly lease, to

22  pay monthly utilities, other location related fees, and to reimburse Barrett Financial

23  Group for office expenditures including, without limitation, expenses pertaining to

24  the office such as for desks, chairs, phones, phone systems, computers, servers,

25

1 copiers, printers, fax machines, office supplies, and miscellaneous expenses. ENG

2 Lending agreed to assume Barrett Financial Group, LLC's existing commercial lease

3 consisting of 5,092 rentable square feet.

4   44. ENG Lending's Net Branch in Mesa became operational on March 9,

5 2012 and Senior Vice President James Emery drafted a letter to notify interested

6 parties that the Mesa Net Branch was a "branch of Bank of England d/b/a ENG

7 Lending," that it operated under ENG Lending's federal exemption and the FDIC

8 Depositor's license number 13303, and that it did not require separate licensure.

9   45. Various state and federal laws and regulations govern the operation of

10 net branches, some of which are quite specific and technical. Further, the rules

11 governing net branch structures can pose substantial risks if unheeded.

12   46. Consequently, with regard to compliance with federal and state

13 regulations, and with respect to the actual operation of the Net Branch in Mesa, the

14 Defendants were in a position of trust and they assumed fiduciary duties in their

15 relationship with the Plaintiffs.

16   47. The parties understood this.

17   48. Barrett understood and reasonably believed, for example, that the

18 Defendants would operate the Mesa Net Branch in accordance with all applicable

19 jurisdictional laws and regulations governing mortgage lending and professional

20 licensing.

21   49. Barrett expected that ENG Lending would commit to oversight of the

22 Net Branch in order to address any federal or state law or regulation irregularities

23 capable of jeopardizing Plaintiffs in any manner.

24   50. ENG Lending is a direct endorsement lender approved by the U.S.

25

1  Department of Housing and Urban Development (HUD) as a non-supervised lender.

2     51.    As such, ENG Lending is required to adhere to HUD policies and

3  regulatory requirements regarding its operations and employees.

4     52.    These rules are serious and HUD audits for compliance with them.

5     53.    Notwithstanding its commitment to Plaintiffs that it would comply

6  with all federal and state statutes and regulations in the operation of the Mesa Net

7  Branch, ENG Lending intentionally and knowingly disregarded HUD and other

8  regulations while operating its Net Branch located in Mesa.

9     54.    Plaintiffs are informed and reasonably believe, for example, that in

10  2012 ENG Lending sought approval to open its Net Branch in Mesa. As part of that

11  approval process ENG Lending certified that it was in compliance with HUD

12  requirements and that it "paid the operating costs of the branch office." Each year

13  thereafter ENG Lending made the same certification.

14     55.    These certifications were knowingly false.

15     56.    As a HUD/FHA approved lender ENG Lending was required to pay all

16  of its operating expenses, including those of its main branch and expenses created

17  through net branch locations.

18     57.    ENG Lending was required to purchase or lease all equipment,

19  computers, servers, copiers, phones, phone systems, and furniture at the Mesa

20  Location.

21     58.    Similarly, ENG Lending was required to pay for necessary supplies

22  and to pay all employee compensation.

23     59.    In addition, ENG Lending was required to pay lease expenditures,

24  overhead,  and other similar expenses.

25

60.     Not only did ENG Lending fail to pay for these items, ENG Lending deducted some or many of these items from Trevor Barrett's commissions and intentionally deceived HUD regarding its operations.

61.     In doing so ENG Lending failed to adequately assume financial responsibility for the correct operation of the Mesa Net Branch.

62.     ENG Lending's operational practices of the Mesa Net Branch maximized its profits but put Plaintiffs at risk. ENG Lending engaged in  deceptive patterns and practices as it maximized its profits at the expense and risk of the Plaintiffs.

63.     One of the prohibited practices knowingly implemented by ENG Lending was the establishment of a "Reserve Account."

64.     Although Federal regulations required ENG Lending to pay all branch office expenses, and prohibited

65.     passing those expenses along to either the branch or to the branch manager

66.     ENG Lending did so anyway.

67.     ENG Lending's admitted purpose in creating the Reserve Account for the Mesa Branch was to provide a working capital reserve from which to fund branch office expenses.

68.     Under the terms of the Branch Management Agreement the amount of the Reserve Account was limited to "the greater of $10,000.00 or two (2) times the estimated monthly Branch Office operating expenses." However, in a meeting on March 13, 2012, Senior Vice President James Emery unilaterally changed those terms. He told Trevor Barrett that ENG Lending would need One Hundred

1   Thousand Dollars ($100,000.00) in the Reserve Account. Emery said that if Trevor

2   couldn't fund the Reserve Account immediately then  each month ENG Lending

3   would take Five Thousand Dollars ($5,000.00) of Trevor's earnings, and  that ENG

4   Lending would apply the money toward the Reserve Account.

5       69.   For the period commencing March 2012 and ending June 2013 ENG

6   Lending withheld Seventy Five Thousand Dollars ($75,000.00).

7       70.   ENG Lending withheld an additional Ten Thousand Dollars

8   ($10,000.00) during the months of April 2014 and May 2014.

9       71.   Plaintiffs are informed and believe that the total amount withheld by

10  ENG Lending was at least Eighty-Five Thousand Dollars ($85,000.00).

11      72.   During this same period, the amount of the actual monthly Net

12  Branch operating expenses was significantly less than the amount wrongfully

13  withheld from Trevor Barrett by ENG Lending.

14      73.   ENG Lending's Reserve Account illegally deprived Trevor Barrett of

15  his lawful compensation (wages) and effectively transferred Mesa Net Branch

16  operational expenses directly to Trevor Barrett, in violation of federal regulations.

17      74.   Moreover, ENG Lending intentionally and knowingly miscalculated

18  the Management Fee by including numerous expenses that ENG Lending was

19  required to pay directly, again in violation of statutes and regulations.

20      75.   ENG Lending has refused and/or failed to refund the Reserve Account

21  fund to Trevor Barrett.

22      76.   ENG Lending intentionally withheld these funds from Trevor Barrett

23  even though it knew that Federal regulations required ENG Lending to pay all of

24  the Mesa Branch's office expenses, that passing those expenses along to either the

25

branch or to the branch manager is strictly prohibited by law, and  that HUD/FHA rules prohibit requiring an employee to use personal funds to cover operational expenses.

77.     ENG Lending knew that HUD/FHA approved mortgagees must pay all expenses incurred in the operation of their home, branch, and direct lending offices, and may not engage in "net branching" arrangements in which a party, other than the approved mortgagee, pays some or all of the branch office expenses.

78.     Notwithstanding the above, ENG Lending instructed Trevor Barrett to cover operational expenses from his personal funds, as evidenced in emails between Trevor Barrett, Brad Canada (Sr. Vice President), Senior Vice President James Emery (Sr. Vice President) and Jack Allen (Corporate Counsel).

79.     This practice is reflected in emails between top executives and officers of ENG Lending.

80.     In one email regarding the Mesa Branch purchasing Lending Tree Leads for the branch, Corporate Counsel Jack Allen wrote the following to Brad Canada, "…I assume Trevor orders and then submits for reimbursement anyway…"

81.     The Mesa Branch closed and funded many Lending Tree leads from which ENG Lending profited.

82.     Each month Trevor Barrett submitted a reimbursement form to the corporate office in Arkansas. However, ENG Lending did not reimburse Trevor for purchasing leads with his personal funds.

83.  In fact, there is over One Hundred Thousand Dollars ($105,064.38) of Trevor Barrett's personal funds that were used to cover operational expenses including but not limited to: BN Touch Inc., FedEx, Lending Tree, Leads360,

1   RingCentral, Staples, USPS, and airline tickets for Mesa Location employees to

2   attend training and conferences held by ENG Lending.

3       84.    ENG Lending engaged in other HUD violations as well.

4       85.    ENG Lending also engaged in practices contrary to policy statements

5   on its own website. For example, ENG Lending's website promised that "ENG will

6   pay or reimburse business expenses related to direct operation of the branch and/or

7   origination of loans. Invoices or expense reports may be submitted to our accounting

8   department and will be paid within 10 working days of receipt – usually within 5.

9   Due to IRS regulations, expenses for entertainment, car leases and capital

10   expenditures (furniture, computers, etc.) will not be reimbursed. All normal

11   operating expenses of the branch are paid directly by ENG as required by HUD."

12       86.    ENG Lending wrongfully required Trevor Barrett as Branch Manager

13   to execute a non-compete clause.

14       87.    ENG Lending wrongfully required Trevor Barrett to indemnify

15   branch-related losses.

16       88.    ENG Lending failed or refused to pay the lease agreement in full at

17   the Net Branch location, exited the sub-lease prematurely, and thereby breached the

18   sublease agreement with Barrett Financial Group.

19       89.    The Sub-Lease Agreement provided for termination "Upon  thirty (30)

20   days written notice to all parties." However ENG Lending did not notify Trevor

21   Barrett or Barrett Financial that it had elected to terminate the Sub-Lease.

22       90.    As a result of ENG Lending's unilateral breach of the Sub-Lease

23   Barrett Financial began paying the obligation, commencing July 2014 in the amount

24   of $8,788.75 per month.

25

1          91.     ENG Lending failed or refused to pay monthly operational costs at the

2   Mesa location.

3          92.     ENG Lending failed and or refused to compensate Barrett Financial

4   and Trevor Barrett for the use of existing office furniture, electronic equipment, and

5   supplies.

6          93.     ENG Lending failed or refused to execute equipment lease agreements

7   at the Net Branch location in its own name.

8          94.     ENG Lending failed to reimburse Trevor Barrett and/or Barrett

9   Financial Group for charges they incurred on credit cards for the operation of the

10  Mesa Net Branch.

11         95.     ENG Lending assessed impermissible fees to the Net Branch. On May

12  14, 2014, Senior Vice President James Emery sent an email to Trevor stating that

13  Trevor was responsible for paying $2,619.58 (Dollars) for a borrower (M. Hakim)

14  who paid off her loan early.

15         96.     On December 4, 2012, Senior Vice President James Emery sent out an

16  email to various branch managers to advise them that ENG Lending's corporate

17  office would be deducting branch profits from the branch profit and loss to match

18  branch employee 401K participation. This was a surprise Trevor Barrett and to

19  other branch managers nationwide as well.

20         97.     ENG Lending's business practices resulted in the Mesa Branch

21  operating without the close supervisory control and oversight HUD requires lenders

22  to maintain over their branch offices.

23         98.     The quality of the compliance assistance provided by ENG Lending

24  was of critical importance to Plaintiffs because poor performance would affect the

25

Mesa Branch's business reputation. Moreover, violations of state and federal law potentially subject violators to monetary sanctions, cease and desist orders, denial of license applications, permanent exclusion from the finance industry, and/or potential misdemeanor or felony criminal prosecution.

99.    The practices described above, and others, reduced Plaintiffs income, compromised the success of the Mesa Branch, and subjected the Plaintiffs to unnecessary costs and risks.

100.    In addition to the HUD violations described above, ENG Lending actively and knowingly engaged in conduct constituting violations of various consumer protection laws.

101.    The Consumer Financial Protection Bureau (CFPB) is an independent agency of the United States government that is responsible for consumer protection in the financial sector.

102.    The CFPB's jurisdiction includes banks, credit unions, securities firms, payday lenders, mortgage-servicing operations, foreclosure relief services, debt collectors, other financial companies operating in the United States, and virtual currencies.

103.    The CFPB was created by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) in the wake of the 2008 financial crisis, and Congress charged it with regulating and enforcing various consumer protection laws. Because of the CFPB and its recent enforcement activities, financial services entities today face significantly more exposure to government investigations, customer complaints, and litigation than they did a few years ago.

104.    CFPB violations include a wide variety of consumer protection laws,

including the Fair Debt Collection Practices Act (FDCPA), the Truth in Lending Act (TILA), and the Real Estate Settlement Procedures Act of 1974 (RESPA). The enforcement of these and other laws was previously dispersed among numerous other agencies, including the Office of Comptroller of the Currency, the Federal Deposit Insurance Company (FDIC), the Department of Housing and Urban Development, and the Federal Trade Commission.

105.    CFPB violations include a broad range of unlawful conduct, including pressuring students to incur "predatory" student loans, racial discrimination and allegations that a bank charged higher prices on mortgage loans to African-American and Hispanic borrowers compared to white borrowers with similar credit scores, discrimination in auto loan interest rates, misrepresentations regarding loan modifications, and charging unlawful upfront fees for debt-relief services.

106.    On April 19, 2012, Senior Vice President James Emery visited Arizona. While driving to lunch with Trevor Barrett, Senior Vice President James Emery informed Trevor Barrett that ENG Lending had recently been audited by the Federal Deposit Insurance Corporation (FDIC).

107.    Emery was unhappy with the results of the audit.

108.    Emery mentioned that the bank had been written up for not making loan exceptions to minorities, specifically African Americans. He then said, "It is a proven fact that black people don't make their mortgage payments."

109.    Trevor Barrett was disappointed and appalled by Emery's remarks. When he returned to the office he informed several Mesa Branch employees of Emery's comments.

110.    Sadly, Trevor Barrett discovered that Emery's comments reflected the

1  corporate culture that was encouraged at ENG Lending.

2       111.    Throughout his employment with ENG Lending, Plaintiff Trevor

3  Barrett observed ENG Lending's discriminatory attitude toward minorities.

4       112.    On March 15, 2014, for example, at the corporate meeting (conference)

5  in Las Vegas at The Wynn, Sterling Barrett was in a restroom stall when he

6  overheard a conversation between "Tommy" Owens (Senior Vice President ENG

7  Lending) and Robert Neighbors (Secondary Marketing Manager for ENG Lending).

8  Sterling heard Roberts say, "<u>Did you see the look on that Nigger's face</u>". Tommy

9  Owens laughed with him and continued with their conversation.

10       113.    Barrett learned that several minority borrowers felt like their loan

11  files were being improperly scrutinized. Some borrowers expressed their feelings to

12  Plaintiffs that they were being discriminated against or treated unfairly from the

13  ENG underwriters.

14       114.    ENG Lending's policies and practices were intentional, willful, or

15  implemented with reckless disregard for the rights of African-American and

16  Hispanic borrowers. ENG Lending based its intentional discrimination on the

17  knowledge of a customer's race and national origin through the Home Mortgage

18  Disclosure Act data collected by its Mortgage Loan Originators.

19       115.    Such discriminatory practices is represented in an email from Senior

20  Vice President Tommy Owen dated  June 4, 2012, which was he delivered  to a

21  couple of corporate employees. However Owen  forgot to take Kristina Cascia (Mesa

22  Branch loan processor) off the email chain. In the email, Owen wrote, "This lady

23  (Kristina Cascia) doesn't know when to quit. I keep telling myself the borrower is

24  suffering from Wendy's (corporate underwriter) incompetence but Kristina is such

25

1 an ass I don't wanna budge! Thoughts" Owen's email reflected ENG Lending's

2 culture that it would rather the borrower (Reece) not receive the loan than fund a

3 loan to an African American.

4     116.   In addition to encouraging racial discrimination in its culture and

5 lending practices, ENG Lending violated numerous other consumer protection

6 statutes and regulations. One of those violations involved ENG Lending's

7 encouragement to Mortgage Loan Originators to grant price concessions to

8 borrowers without approval of the branch manager.

9     117.   As Branch Manager Trevor set branch margins in order to be

10 profitable. Those margins were set at 280 basis points for conventional loans and/or

11 300 basis points for FHA/VA/USDA loans, plus $600.00 (Dollars) per loan.

12     118.   Trevor Barrett set those margins to ensure the financial success of the

13 Branch.

14     119.   Correspondingly, Trevor Barrett derived his income based on the gross

15 profit of the Mesa Net Branch.

16     120.   On March 12, 2012, at The Peabody Little Rock in the hotel lounge,

17 Senior Vice President Michael Cupples informed Trevor Barret about "compensation

18 buckets" in connection with adjusting a Mortgage Loan Originator's compensation.

19     121.   Cupples instructed Trevor Barrett to create buckets for accounting

20 purposes and to allow the Mortgage Loan Originators in Mesa to grant price

21 concessions to borrowers to be able to be more competitive when needed.

22     122.   This instruction  violated ENG Lending's written policy, (dated April

23 1, 2011). and exemplifies a common pattern at ENG Lending when an accepted

24 practice varies from written policy documents. ENG Lending encouraged the actual

25

practice of encouraging a Mortgage Loan Originator to give pricing concessions to borrowers. Total price concessions and losses to the Mesa Location from March 2012 through June 13, 2014 totaled $313,949.99 (Dollars).

123.    The majority of the loans that ENG Lending closed at the Mesa Location accompanied price concessions to borrowers which were initiated by the Mortgage Loan Originator following approval by the Closing Department and/or the Lock Desk at the corporate office–but without branch approval.

124.    As Branch Manager Trevor Barrett was rarely made aware that the corporate office had approved–or even that the Mortgage Loan Originator in Mesa had requested–a pricing concessions on behalf of a borrower. At some point Trevor Barrett might receive a reconciliation report from accounting that reflected the pricing concession.

125.    This was alarming because, as stated above, the practice violated consumer protection regulations, because ENG Lending's written policy differed from its actual practice, and because ENG Lending's practice of encouraging loan concessions also reduced the Net Branch profitability (and, correspondingly, the compensation earned by Trevor Barrett).

126.    During the final months before the Mesa Branch was closed Mortgage Loan Originators were encouraged by Senior Vice President James Emery and Tempe Branch Manager Steve Smith to give pricing concessions to the borrowers in order to close out the pipeline in the Mesa Branch thus reducing the profit the Mesa Branch was entitled too. Total price concessions Mesa branch Mortgage Loan Originators gave to borrower from mid-April 2014 to the last closed and funded loan total $26,787.60.

127.    By way of examples, mortgage loan originator Anthony Sistak on June 27, 2014 closed the *Van Harper* loan (loan number 481403089453) giving a pricing concession to the borrower from the branch profits with the Mesa Branch taking a loss of $6,788.79. On June 12, 2014 mortgage loan originator Christopher Greiner closed the *David Everman* loan (loan number 481404091014) giving a pricing concession to the borrower from the branch profits, with the Mesa Branch taking a loss of $3,191.65.

128.    In addition to the above, Plaintiffs discovered that ENG Lending knowingly and actively concealed from borrowers affiliated business arrangements.

129.    This practice also violated consumer protection statutes and regulations.

130.    On March 13, 2012, at the corporate office during one of the various meetings, Plaintiff Trevor Barrett met with Dan McLaughlin at Bankers Title.

131.    McLaughlin informed Trevor Barrett that the *Canada* family was one of the owners of Banker's Title Company, that ENG Lending's Net Branch in Mesa would need to use Bankers Title. There was never an "Affiliated Business Arrangement Disclosure Statement Notice" disclosed to any of the ENG Lending's borrowers. At all times pertinent hereto, Gary Canada served as President of the Bank of England and his son, Brad Canada, served as Vice President of Bank of England's mortgage division, also known as ENG Lending.

132.    This practice of non-disclosure constitutes   serious violations of federal law, including without limitation the violation of rules which prevent mortgage originators from making more money by getting the consumer to buy certain services from the lender, broker, or one of its affiliates.

133.    In addition to the above, ENG Lending adopted other prohibited practices in violation of state and federal law. For example, ENG Lending instituted a practice of temporarily terminating some employees to avoid reporting them as employees to the Department of Labor. After running the payroll reports for the Department of Labor, ENG Lending would reactivate the employee on its payroll software.

134.    On April 4, 2014 two Mesa Location Mortgage Loan Originators (Don Lee & Larry Keen) attempted to log their hours into ENG Lending's payroll system ("Paycom"). Both showed *terminated* on Paycom and were unable to log their hours worked.

135.    When Sterling Barrett emailed Rebecca Price (ENG Lending's Payroll Coordinator) asking "why does Paycom show Don Lee & Larry Keen as terminated?" Rebecca Price responded, "Probably because neither have been paid in a while and the bank terminated them before doing an employee numbers report. They can be reactivated."

136.    Immediately after receiving Rebecca Price's email Sterling followed up with a phone call.  During the phone call Rebecca Price informed Sterling that ENG Lending had needed to run a report for the Department of Labor and it couldn't show any employees not getting paid, so ENG Lending simply terminated them from the payroll system. ENG Lending then generated a false and misleading report for the government before reactivating the employee on Paycom.

137.    In violation of its obligations to act in good faith, ENG Lending's officers and senior executives played favoritism with certain employees and with net branch managers by offering uneven terms. For example, on March and April 2014

1   Trevor began to recruit Mortgage Loan Originator's in the Scottsdale area.  Senior

2   Vice President James Emery called Trevor on April 8, 2014 at 1:54 PM Arizona time

3   to discuss this issue and informed him that Steve Smith had a net branch already in

4   Scottsdale. This Scottsdale branch was not on the records, had not been approved by

5   any financial regulator, and was not even on the company's website at the time.

6       138.    On April 16, 2014 Senior Vice President James Emery called Trevor

7   Barrett. During that phone conversation Trevor Barrett brought to James Emery's

8   attention that he had not received compensation for working. James Emery  told

9   Trevor to find other employment. He gave Trevor 60 days. Within a week Steve

10  Smith of the Tempe Branch requested that Barrett's Mortgage Loan Originator be

11  transferred to his branch.

12      139.    Senior Vice President James Emery wrongfully terminated Trevor

13  Barrett and failed to follow specific disciplinary and termination policies that ENG

14  Lending had in place.  Trevor received no written warning for misconduct or for

15  poor performance before Senior Vice President James Emery terminated him.

16      140.    The net branches of Tempe and Mesa were roughly 11 miles apart.

17  The interest rates offered to borrowers and fee disparity charged to borrowers with

18  the same credit characteristics and loan products were statistically significant

19  between both branches.

20      141.    The Tempe net branch charged higher interest rates and higher fees

21  to borrowers with the same credit characteristics and loan products than the Mesa

22  net branch.

23      142.    Senior Vice President James Emery enforced a policy that it required

24  Mortgage Loan Originators to steer loans in-house, charging the borrower higher

25

interest rates and fees rather than having the option to broker a loan to a wholesale lender thus giving the borrower the lowest interest rate and fees. Borrowers trust that their mortgage loan originator will give them the best option possible.

143.   The practice of the Mesa net branch was to close and fund a loan that was in the best interest of the borrower whether it was closed and funded in-house or brokered to a wholesale lender.

144.   The practice of the Tempe net branch was to close and fund the overall majority of loans in-house regardless of the borrower getting the best rate and fees thus maximizing the profits of ENG Lending.

145.   Senior Vice President James Emery encouraged the Mortgage Loan Originators at the Mesa Branch to transfer to the Tempe Branch by offering that their draws against commission owed to the Mesa Branch would be forgiven. This violated ENG Lending's duty of good faith and fair dealing. It also directly affected the profitability of the Mesa branch.

146.   Upon information and belief, Mortgage Loan Originators at the Tempe net branch receive marketing incentives if they "up-charge" borrowers on their mortgage rates on in-house loans. The Mortgage Loan Originators use the higher profits for their personal marketing use as a form of compensation based on the borrower getting a higher than normal interest rate.

147.   On June 12, 2014 3:02 PM Trevor Barrett received an email from Lynn Davis (Director of Human Resources) stating "separation of employment with Bank of England / ENG Lending will be documented as a Lay-Off."

## CAUSES OF ACTION

## COUNT I

**(For Failure to Pay Wages Including Violations of A.R.S. §23-353(A) et. seq.)**

148.   Plaintiffs reassert and incorporate all of the allegations contained in the foregoing paragraphs as though more fully set forth herein.

149.   In 2014 Plaintiff Trevor Barrett (together with employee Andrew Price) were discharged from their employment at ENG Lending.

150.   Notwithstanding the compensation policies, and the agreements between the parties, ENG Lending did not compensate Trevor Barrett for work performed.

151.   As noted in the preceding paragraphs, ENG Lending established a Reserve Account. In order to fund the Account ENG Lending wrongfully withheld commissions earned by Trevor Barrett.

152.   The Branch Manager Employment Agreement limited the Reserve Account to Ten Thousand Dollars ($10,000.00). However the Reserve Account was to accumulate from the branch's net profits, not from Trevor Barrett's lawfully entitled earnings.

153.   Further, in order to provide a working capital reserve sufficient to fund Branch Office expenses, the Branch Manager Employment Agreement expressly stated that the Reserve Account funds would "accumulate from available Branch Office net profits."

154.   Even then, the Reserve Account would be limited to "the greater of $10,000.00 or two (2) times the estimated monthly Branch Office operating expenses."

155.   ENG Lending never intended on abiding by the terms of the Employment Agreement regarding the operation of the Reserve Account. ENG

Lending never attempted to estimate or calculate the monthly Branch operating expenses, and never advised Trevor Barrett regarding these operating expenses.

156.    Instead, on March 13, 2012, and contrary to the terms of the written Employment Agreement, Senior Vice President James Emery unilaterally notified Trevor Barrett that ENG Lending intended on establishing a Reserve Account of One Hundred Thousand Dollars ($100,000.00). Each month thereafter ENG Lending would take Five Thousand Dollars ($5,000.00) of Trevor's pay and apply it to the Reserve Account.

157.    The Employment Agreement allowed ENG Lending to adjust the Reserve Account "at any time based on actual expenses of the Branch Office" but required that ENG Lending would first notify Trevor Barrett  "in writing if and when the Reserve Account balance has been adjusted." This never happened.

158.    Further, the actual practice by ENG Lending with respect to the Reserve Account violated federal statutes and/or regulations and constituted bad faith by ENG Lending.

159.    ENG Lending's deception with respect to the Reserve Account was intended to defraud Trevor Barrett of his income.

160.    As a result of this practice by ENG Lending, there were many months when Trevor Barrett would not receive a pay check.

161.    Out of 55 pay periods Trevor received compensation for just 18 of them. (See Exhibit "A" attached hereto and incorporated herein by this reference). For two of those pay periods Trevor Barrett received $40.00 (Dollars) and $300.00 (Dollars) respectively.

162.    Pay periods were usually every 2 or 3 weeks. No minimum wage was

paid and ENG Lending never paid Trevor Barrett overtime pay.

163.    In all, ENG Lending withheld not less than Eighty-Five Thousand Dollars ($85,000.00) that should have been paid to Trevor Barrett as employment income.

164.    During the final two months of Trevor's employment ENG Lending attempted to conceal its failure to pay wages by offering to pay Trevor Barrett One Thousand Dollars ($1,000.00) per pay period.

165.    Further, the Branch Manager Employment Agreement provides that: "[i]n the event of the termination of this Agreement for any reason other than Branch Manager's fraudulent conduct (as supported by third party audit) and after a 120 day settlement period, the aggregate remaining balance of the Reserve Account shall be paid to the Branch Manager or his estate in final settlement."

166.    Following ENG Lending's termination of Trevor Barrett's employment, ENG Lending withheld the aggregate remaining balance of the Reserve Account, and failed to otherwise provide an accounting thereof.

167.    Improperly compensating Mesa Branch employees was not limited to Plaintiff Trevor Barrett. ENG Lending similarly engaged in a practice to not compensate Andrew Price for work performed during 12 separate pay periods.

168.    On August 28, 2014, Andrew notified ENG Lending that he had gone without pay for the full time hours of 40 hours per week for 8 pay periods, but that he had actually worked the following hours during pay periods for which he had not received compensation: 08/30/2013 (80 hours), 09/13/2013 (80 hours), 09/30/2013 (80 hours), 10/15/2013 (80 hours), 11/29/2013 (120 hours), 12/13/2013 (80 hours), 01/15/2014 (80 hours), and 01/13/2014 (120 hours), as reflected below:

1    169.    During these time periods Andrew did not receive a draw or any

2    income of any kind. Nor did Andrew have the option to log his hours using ENG

3    Lending's software.

4    170.    ENG Lending's corporate policy was to remove the Branch Manager

5    and Sales Managers from logging hours into Paycom.

6    171.    In addition to the above, there were four pay periods where Andrew

7    earned commissions but was not paid: 02/14/2014 (80 hours), 02/28/2014 (80 hours),

8    and 03/31/2014 (80 hours).

9    172.    On September 11, 2014 ENG Lending's corporate attorney, Jack Allen,

10   responded that "Bank of England is ceasing all communications with you. As I

11   stated when we spoke a number of weeks ago, the Bank does not believe any

12   wrongdoing has occurred. We will not be settling this matter at this time."

13   173.    Pursuant to A.R.S. §23-353(A), Plaintiff Trevor Barrett (and Andrew

14   Price) should have been paid within three working days of their terminations.

15   174.    Despite demand, Defendant ENG Lending has refused to pay Trevor

16   Barrett or Andrew Price their wages earned.

17   175.    As a direct and proximate result of Defendant ENG Lending's failure

18   to pay Plaintiff, Trevor Barrett is entitled to treble the amount of unpaid wages

19   pursuant to A.R.S. § 23-355(A).

20   176.    This claim arises out of contract, entitling Plaintiff to an award of

21   attorney's fees pursuant to A.R.S. §12-341.01 or the written terms of any

22   agreements between the parties.

23   ## COUNT II

24   **(For Overtime Violations)**

25

177.   Plaintiffs reassert and incorporate all of the allegations contained in the foregoing paragraphs as though more fully set forth herein.

178.   The FLSA requires covered employers, such as Defendant ENG Lending, to compensate all non-exempt employees at a rate of not less than one and one-half times the regular rate of pay for work performed in excess of forty (40) hours per workweek. When calculated, the regular rate of pay must include all non discretionary compensation.

179.   In practice, Defendant ENG Lending treated Plaintiff Trevor Barrett (and Andrew Price) as exempt from overtime premium compensation under the FLSA.

180.   Upon information and belief, Defendant ENG Lending paid Plaintiff Trevor Barrett and Andrew Price under a compensation agreement that would:

     a.   allegedly pay these employees at an hourly rate equal to the greater of the federal or state minimum wage for each hour worked in a workweek and would pay 1.5 times this hourly rate for hours worked in excess of forty per workweek (referred to herein as a "draw");

     b.   pay these employees non-discretionary compensation based on originated residential mortgage loans; and

     c.   deduct the employees draw amount from commission compensation.

181.   Under its compensation agreement with Plaintiff, Defendant ENG Lending failed to pay an overtime premium for hours worked in excess of forty per week in violation of the FLSA. Defendant ENG Lending's compensation agreement

violated the FLSA in that it failed to include commission income in determining the overtime rate of pay. In addition, Defendant ENG Lending's compensation agreement violated the FLSA in that any purported overtime paid under this scheme was later deducted from commission pay, therefore, no overtime premium of any time was even paid on the minimum wage.

182.    Under Defendant ENG Lending's compensation agreement with Plaintiff,  employees would earn the same amount of compensation regardless of hours reported or worked. Therefore, no overtime premium was ever provided to these employees under Defendant's compensation agreement. In turn, Defendant ENG Lending discouraged employees from reporting actual hours worked since it had no impact on total compensation paid under Defendant ENG Lending's illegal compensation agreement.

183.    Defendant ENG Lending was aware, or should have been aware, that Plaintiff performed work that required payment of overtime compensation and that its non-discretionary commission income must be included when calculating the overtime rate of pay.

184.    Defendant ENG Lending's conduct was willful and in bad faith.

185.    Defendant ENG Lending routinely suffered and permitted Plaintiff to work more than forty (40) hours per week and did not pay the overtime compensation that was due.

186.    Defendant ENG Lending required Plaintiff to work long hours to complete all of job responsibilities.

187.    Upon information and belief, Defendant ENG Lending did not keep accurate records of these hours worked by Plaintiff as required by law.

188.   Defendant ENG Lending was aware of the hours and overtime hours that Plaintiff worked.

189.   Moreover, it is common knowledge within the financial industry that courts and the United States Department of Labor have found Mortgage Loan Originators to be non-exempt and entitled to overtime compensation, and that commission income should be included in calculating their overtime rate of pay.

190.   Defendant ENG Lending operates under a scheme to deprive certain employeesof overtime compensation by treating them as exempt in practice; failing to accurately compensate at the correct overtime rate of pay; and by failing to make, keep, and preserve records of their hours worked.

191.   Plaintiff Trevor Barrett was deprived of overtime pay that he was guaranteed by law.

192.   Plaintiff Trevor Barrett is a victim of Defendant's widespread, repeated, systemic and consistent illegal policies that have resulted in violations of his rights under the FLSA, 29 U.S.C. § 201 *et seq.*, and that have caused damage to Plaintiff.

193.   Defendant ENG Lending willfully engaged in a  pattern of violating the FLSA, 29 U.S.C. § 201 et seq., as described herein including, without limitation, failing to pay Trevor Barrett overtime compensation.

194.   Defendant ENG Lending's conduct constitutes willful violations of the FLSA within the meaning of 29 U.S.C. §255.

195.   Defendant ENG Lending's actions, policies, and/or practices as described violate the FLSA's overtime requirement by regularly and repeatedly failing to compensate Plaintiff Trevor Barrett at the required overtime rate.

1    196.    Defendant ENG Lending knew, or show reckless disregard for the fact,

2    that it failed to pay Plaintiff overtime compensation in violation of the FLSA.

3    197.    Defendant ENG Lending is liable under the FLSA for failing to

4    properly compensate Plaintiff Trevor Barrett.

5    198.    As a direct and proximate cause of Defendant ENG Lending's

6    unlawful conduct, Plaintiff Trevor Barrett has suffered a loss of income and other

7    damages. Plaintiff Trevor Barrett is entitled to liquidated damages and attorney's

8    fees and costs incurred in connection with this claim.

9    ## COUNT III

10   **(For Breach of Contract)**

11   199.    Plaintiffs reassert and incorporate all of the allegations contained in

12   the foregoing paragraphs as though more fully set forth herein.

13   200.    Defendant ENG Lending breached obligations under both oral

14   promises and written agreements between the parties as described herein.

15   201.    For example, and without limitation, on April 11, 2012, ENG Lending

16   formally entered into a month-to-month Sub–Lease Agreement for the Mesa

17   commercial space occupied by Barrett Financial Group. However the Mesa Net

18   Branch became operational in March 2012. ENG Lending failed or refused to

19   commence sub-lease payments, or to reimburse Barrett Financial Group, for the

20   March and April 2012 sub-lease payment.

21   202.    Although contrary to the agreements of the parties, Senior Vice

22   President James Emery informed Trevor Barrett that he would be responsible for

23   making the lease payments for the first few months (March & April 2012).

24   203.    ENG Lending formally assumed the sub-lease in March 2012.

25

1    Pursuant to HUD/FHA rules, ENG Lending should have formally assumed financial

2    responsibility to pay the lease payments when the Mesa Branch became operational

3    in March 2012. Instead, ENG Lending did not make the first payment on the Sub-

4    Lease until May 2012.

5         204.    When the lease ended at the Mesa Location on February 28, 2013,

6    ENG Lending notified Plaintiff that renewing the Lease would put ENG Lending at

7    risk, and that ENG Lending did not want to assume that liability, stating that "it

8    was too much risk." On behalf of ENG Lending, Senior Vice President James Emery

9    instructed Trevor Barrett to sign the renewal lease, though this instruction was

10   contrary to the terms of their existing agreements, and contrary to HUD/FHA

11   regulations as well.

12        205.    In the spring of 2014 ENG Lending abandoned its financial obligation

13   to pay the sub-lease.

14        206.    ENG Lending also failed and/or refused to pay the operational location

15   costs, or otherwise failed and/or refused to reimburse Trevor Barrett and Barrett

16   Financial Group for costs and expenses it incurred for the Mesa Net Branch

17   location.

18        207.    In addition, and without limitation, Defendant ENG Lending failed to

19   pay appropriate wages to Trevor Barrett according to the terms of his employment.

20        208.    Defendant ENG Lending otherwise violated the terms of the

21   employment agreements with Plaintiff.

22        209.    Defendant failed to remedy their breaches upon reasonable

23   notification by Plaintiff.

24        210.    The actions and/or inactions by Defendants, their officers, directors,

25

agents, and/or employees, as described herein, constituted material breaches of the contracts and the agreements between the parties.

211.   As a result of Defendants' breaches Plaintiffs suffered damages in an amount to be proven at trial.

212.   Plaintiffs are entitled to their full damages as a result of the Defendant's breach of contract, together with pre-interest thereon in an amount to be proven at trial.

213.   This claim arises out of contract, entitling Plaintiffs to an award of attorneys' fees pursuant to A.R.S. §12-341.01 or the written terms of any agreements between the parties.

## **COUNT IV**

### **(For Breach of Covenant of Good Faith and Fair Dealing)**

214.   Plaintiffs reassert and incorporate all of the allegations contained in the foregoing paragraphs as though more fully set forth herein.

215.   In Arizona every contract contains an implied covenant of good faith and fair dealing.

216.   The contracts and the agreements between Plaintiffs and Defendants contained covenants of good faith and fair dealing including, without limitation, an obligation by the parties to deal honestly and fairly, and covenants by the parties not to deprive the other parties of the anticipated benefits of the agreements by failing to perform their obligations.

217.   The Defendants owed Plaintiffs duties to act in good faith and fair dealing.

218.   The Defendants, by their actions established in the preceding

1  paragraphs, violated and breached their duties of good faith and fair dealing to

2  Plaintiffs.

3      219.   The actions or omission by the Defendants have been the direct

4  proximate and cause of damages to Plaintiffs in amounts that shall be proven at

5  trial.

6      220.   This claim arises out of contract, entitling Plaintiffs to an award of

7  attorneys fees pursuant to A.R.S. §12-341.01 or the written terms of any agreements

8  between the parties.

9  ## COUNT V

10  **(For Breach of Joint Venture Agreements)**

11      221.   Plaintiffs reassert and incorporate all of the allegations contained in

12  the foregoing paragraphs as though more fully set forth herein.

13      222.   As described herein, the parties hereto entered into one or more joint

14  venture agreements including, without limitation, the venture designed to establish

15  the Mesa Net Branch, and to provide mortgage related services in Maricopa County,

16  State of Arizona.

17      223.   Without limitation, Defendants accomplished its designs in part by

18  inducing Plaintiffs to extend their credit, their reputation, and their facilities, and to

19  participate in establish and help operate the Mesa Net Branch which assets and

20  efforts  were used jointly and severally by the venturers.

21      224.   Upon information and belief Defendants would eventually generate

22  many thousands of dollars by providing these services in order to complete the

23  parties' joint ventures.

24      225.   Defendants were also subject to common duties as shall be proved at

25

trial.

226.    The conduct of the Defendants, their officers, directors, agents, and employees identified herein as John and Jane Does, constituted a joint venture that included a common purpose, community of interest, and equal right of control.

227.    Each of the joint venturers acted as agents of the others and each likewise acted as a principal such that the act of one was the act of all.

228.    As a result of Defendants' actions Plaintiffs have been damaged in an amount to be proved at trial for which the Defendants, and each of them, are jointly and severally liable.

229.    This claim arises out of contract, entitling Plaintiffs to an award of attorneys fees pursuant to A.R.S. §12-341.01 or the written terms of any agreements between the parties.

## COUNT VI

### (For Vicarious Liability Arising From Joint Venture Agreement)

230.    Plaintiffs reassert and incorporate all of the allegations contained in the foregoing paragraphs as though more fully set forth herein.

231.    As described herein, the venturers provided mortgage related services in Maricopa County, State of Arizona.

232.    Upon information and belief Defendants would eventually generate many thousands of dollars in profits by providing these services.

233.    Defendants were also subject to common duties as shall be proved at trial.

234.    The conduct of the Defendants, their officers, directors, agents, and employees identified herein as John and Jane Does, constituted a joint venture that

1  included a common purpose, community of interest, and equal right of control.

2     235.    Defendants entered into a joint venture with Plaintiffs designed to

3  provide and sell mortgage services (as described herein).

4     236.    Without limitation, Defendants accomplished its designs in part by

5  inducing Plaintiffs to extend its credit, its reputation, and its facilities, and to

6  participate in establish and help operate the Mesa Net Branch which assets and

7  efforts  were used jointly and severally by the venturers.

8     237.    Each of the joint venturers acted as agents of the others and each

9  likewise acted as a principal such that the act of one was the act of all.

10     238.    As a result of Defendants' actions Plaintiffs have been damaged in an

11  amount to be proved at trial for which the Defendants, and each of them, are jointly

12  and severally liable.

13     239.    This claim arises out of contract, entitling Plaintiffs to an award of

14  attorneys fees pursuant to A.R.S. §12-341.01 or the written terms of any agreements

15  between the parties.

## COUNT VII

### (For Negligence)

18     240.    Plaintiffs reassert and incorporate all of the allegations contained in

19  the foregoing paragraphs as though more fully set forth herein.

20     241.    Defendant had numerous duties to Plaintiffs as described herein

21  including, without limitation, the duty to act fairly and truthfully with the

22  Plaintiffs, the duty to act competently in adopting and executing the policies and the

23  operations of the Mesa Net Branch, the duty to pay wages, the duty to train and

24  properly supervise its directors, officers, agents, and employees.

25

1    242.    Defendant breached its duties of care as described herein.

2    243.    As a direct and proximate result of Defendant's negligence, Plaintiff

3  has suffered damages in an amount to be proven at trial.

4    244.    This claim arises out of contract, entitling Plaintiffs to an award of

5  attorney's fees pursuant to A.R.S. §12-341.01 or the written terms of any

6  agreements between the parties.

7    **COUNT VIII**

8    **(For Breach of Fiduciary Duty)**

9    245.    Plaintiffs reassert and incorporate all of the allegations contained in

10  the foregoing paragraphs as though more fully set forth herein.

11    246.    Defendant breached its duties of care as described herein.

12    247.    As a result of Defendant's negligence, acts, and omissions, Plaintiffs

13  have suffered damages in an amount to be proven at trial.

14    248.    This claim arises out of contract, entitling Plaintiffs to an award of

15  attorneys' fees pursuant to A.R.S. §12-340.01 or the written terms of any

16  agreements between the parties.

17    **COUNT IX**

18    **(For Fraud)**

19    249.    Plaintiffs reassert and incorporate all of the allegations contained in

20  the foregoing paragraphs as though more fully set forth herein.

21    250.    The acts by Defendants described herein were intentional.

22    251.    Specifically, Defendant ENG Lending, through its officers, directors,

23  agents, and employees, made intentional false representations regarding the wages

24  and remuneration that it would pay to Plaintiffs, the funds that it would pay to

25

Plaintiff Trevor Barrett, the operation of the net branch, and those other representations described above, including the Defendant's representation that it operated in compliance with all state and federal laws.

252.   Defendant also knowingly withheld material knowledge regarding the matters described herein including, without limitation, the Defendant's operations and the Defendant's commitment to abide by the contracts and agreements made between Defendant and Plaintiffs.

253.   Defendants made these statements, and knowingly withheld material information, intending that Plaintiffs would rely thereon, and further that Plaintiffs would act based on the information provided to them.

254.   Plaintiffs believed the information provided to them was true and further believed that Defendant and its officers, directors, agents, and employees had disclosed all material information.

255.   Plaintiffs did justifiable rely on these and other statements made by the Defendant, through its officers, directors, agents, and/or employees to the Plaintiffs detriment.

256.   Plaintiffs have been damaged thereby.

257.   This claim arises out of contract, entitling Plaintiffs to an award of attorney's fees pursuant to A.R.S. §12-341.01 or the written terms of any agreements between the parties.

## COUNT X

### (For Misrepresentation)

258.   Plaintiffs reassert and incorporate all of the allegations contained in the foregoing paragraphs as though more fully set forth herein.

1    259.   Upon information and belief, and pleading in the alternative, if the

2   actions of the Defendant and/or its officers, directors, agents, or employees did not

3   constitute fraud, they constituted negligent misrepresentation.

4    260.   Defendant ENG Lending, its officers, directors, agent, or employees,

5   had a duty not to misrepresent facts to the Plaintiffs, and Defendant ENG Lending

6   breached its duty resulting in serious damage to the Plaintiffs in an amount to be

7   proved at trial.

8    261.   The information that Defendant ENG Lending disclosed by and

9   through its officers, directors, agents, or employees was false, or Defendant failed to

10   disclose all material information as described in the preceding paragraphs.

11    262.   Defendant ENG Lending and its officers, directors, agents, or

12   employees provided (or withheld) this information with the intent that the Plaintiffs

13   would rely thereon.

14    263.   Defendant ENG Lending and its officers, directors, agents, or

15   employees failed to exercise reasonable care in communicating relevant information

16   to the Plaintiffs.

17    264.   Plaintiffs justifiably relied to their detriment on the information

18   provided to him by the Defendant ENG Lending, its officers, directors, agents, or

19   employees.

20    265.   Plaintiffs were damaged in an amount to be proved at trial.

21    266.   This claim arises out of contract, entitling Plaintiffs to an award of

22   attorney's fees pursuant to A.R.S. §12-341.01 or the written terms of any

23   agreements between the parties.

24                              **COUNT XI**

25

**(For Quantum Merit or Quantum Valebant)**

267.   Plaintiffs reassert and incorporate all of the allegations contained in the foregoing paragraphs as though more fully set forth herein.

268.   Plaintiffs are entitled to exercise their rights and privileges granted in the agreements between the parties.

269.   Plaintiffs are further entitled to a judicial determination of their rights arising from the agreements of the parties, including a determination of the obligations of the parties thereto.

270.   Without limitation to the other acts or omissions described herein, Defendant ENG Lending wrongfully deprived the Plaintiffs of their income and/or other property.

271.   Plaintiffs have been impoverished and have suffered financially as a result of Defendant ENG Lending's failure to remit to Plaintiffs.

272.   Plaintiffs' impoverishments are a direct result of the Defendant ENG Lending's acts and omissions.

273.   By Defendant ENG Lending's failure to remit the wages to Plaintiffs, to return funds wrongfully withheld, to reimburse Plaintiff Barrett Financial Group for operational expenses and lease payments, or to deliver such other benefits owed to the Plaintiffs Defendants have been unjustly enriched.

274.   There is no legal or equitable justification for either the enrichment of the Defendants or for the corresponding impoverishment of the Plaintiffs.

275.   In the alternative to any legal claims otherwise set forth in this Complaint, Plaintiffs have no remedy at law for the Defendants' actions.

276.   Defendants have been unjustly enriched thereby.

277.    These claims arise out of contract, entitling Plaintiffs to an award of attorneys' fees pursuant to ARS §12-341.01 or the written terms of any agreements between the parties.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully demand judgment against Defendants, jointly and severally, as follows:

A.    For an award of general damages in the amount of $3,000,000.00 (Dollars), together with accrued interest through the date of the filing this Complaint, and continuing to accrue on the principal balance owed at the rate of 12.5% per annum, until paid, after deducting all payment and just credits; and

B.    For judgment against Defendant ENG Lending finding that it misclassified Plaintiff Trevor Barrett and other employees as exempt; and

C.    For judgment against Defendant ENG Lending for Plaintiff Trevor Barrett for unpaid back wages, and for back wages at the applicable overtime rates, together with an amount equal to their damages as liquidated damages; and

D.    For a finding that Defendant ENG Lending's violations of state and federal wage and employment laws were willful; and

E.    For treble damages pursuant to A.R.S. §23-355(A); and

F.    For reasonable attorneys' fees and costs incurred by Plaintiffs, pursuant to the express terms of the Agreement, ARS §§12-340 and 12-341.01(A), and any other applicable law, with interest at the rate of ten percent (10%) per annum from the date of the judgment, until paid, plus attorneys' fees of not less than $12,500.00 pursuant to Rule 55(b)(1) of the Arizona Rules of Civil Procedure in the event of a judgment by default; and

G.     For taxable costs incurred by Plaintiffs, as defined by statute; and

H.     For an award of prejudgment interest (to the extent liquidated damages are not awarded); and

I.     For leave to amend to add additional state and federal law claims; and

J.     For post-judgment interest on any monetary award at the statutory rate; and

K.     For such other and further relief as this Court deems just and appropriate.

Date: November 12, 2015.          Respectfully Submitted,

/s/ *Roger A. Wright*

Roger A. Wright (SBN 014105)
WRIGHT LAW FIRM, PLC
1013 S Stapley Drive
Mesa, Arizona 85204
Telephone: (480) 558-1700
Email: office@wrightlawaz.com

**Attorneys for Plaintiffs**
**Barrett Financial Group, LLC and**
**Trevor Barrett**